# CREDIT AGREEMENT AND DISCLOSURE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $1,250,000.00 | 01-26-2023 | 01-26-2043 | [redacted] | 19 / *NOT USED* | | EBM | |

References in the boxes above are for our use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

| | | | |
|---|---|---|---|
| **Borrower:** | ROBERT WARREN BECKHAM<br>295 JONES PKWY<br>BRENTWOOD, TN 37027 | **Lender:** | FIRST NATIONAL BANK OF MIDDLE TENNESSEE<br>MUSIC ROW BRANCH<br>200 EAST MAIN STREET<br>MCMINNVILLE, TN 37110 |

**CREDIT LIMIT: $1,250,000.00** **DATE OF AGREEMENT: January 26, 2023**

**Introduction.** This Credit Agreement and Disclosure ("Agreement") governs your line of credit (the "Credit Line" or the "Credit Line Account") issued through FIRST NATIONAL BANK OF MIDDLE TENNESSEE. In this Agreement, the words "Borrower," "you," "your," and "Applicant" mean each and every person who signs this Agreement, including all Borrowers named above. The words "we," "us," "our," and "Lender" mean FIRST NATIONAL BANK OF MIDDLE TENNESSEE. **You agree to the following terms and conditions:**

**Promise to Pay.** You promise to pay FIRST NATIONAL BANK OF MIDDLE TENNESSEE, or order, the total of all credit advances and **FINANCE CHARGES**, together with all costs and expenses for which you are responsible under this Agreement or under the "Deed of Trust" which secures your Credit Line. You will pay your Credit Line according to the payment terms set forth below. **If there is more than one Borrower, each is jointly and severally liable on this Agreement. This means we can require any Borrower to pay all amounts due under this Agreement, including credit advances made to any Borrower. Each Borrower authorizes any other Borrower, on his or her signature alone, to cancel the Credit Line, to request and receive credit advances, and to do all other things necessary to carry out the terms of this Agreement. We can release any Borrower from responsibility under this Agreement, and the others will remain responsible.**

**Term.** The term of your Credit Line will begin as of the date of this Agreement ("Opening Date") and will continue until January 26, 2043 ("Maturity Date"). All indebtedness under this Agreement, if not already paid pursuant to the payment provisions below, will be due and payable upon maturity. The draw period of your Credit Line will begin on the later of January 31, 2023 or the recording of the Deed of Trust (the "Effective Disbursement Date") and will continue as follows: Five (5) years. You may obtain credit advances during this period ("Draw Period"). After the Draw Period ends, the repayment period will begin and you will no longer be able to obtain credit advances. The length of the repayment period is as follows: Fifteen (15) years. You agree that we may renew or extend the period during which you may obtain credit advances or make payments. You further agree that we may renew or extend your Credit Line Account.

**Minimum Payment.** Your "Regular Payment" will equal the amount of your accrued **FINANCE CHARGES** ("First Payment Stream"). Your payments will be due monthly. Your First Payment Stream will last for the first 60 months. Your "Minimum Payment" will be the Regular Payment, plus any amount past due and all other charges. An increase in the **ANNUAL PERCENTAGE RATE** may increase the amount of your Regular Payment. The Minimum Payment during the First Payment Stream will not reduce the principal that is outstanding on your Credit Line.

After completion of the First Payment Stream, your "Regular Payment" will be based on your outstanding balance as shown below ("Second Payment Stream"). Your payments will be due monthly.

| Range of Balances | Number of Payments | Amortization Period |
|---|---|---|
| All Balances | 180 | 180 payments |

Your "Minimum Payment" will be the Regular Payment, plus any amount past due and all other charges.

A change in the **ANNUAL PERCENTAGE RATE** can cause the balance to be repaid more quickly or more slowly. When rates decrease, less interest is due, so more of the payment repays the principal balance. When rates increase, more interest is due, so less of the payment repays the principal balance. If this happens, we may adjust your payment as follows: your payment may be increased by the amount necessary to repay the balance by the end of this payment stream. Each time the **ANNUAL PERCENTAGE RATE** changes, we will review the effect the change has on your Credit Line Account to see if your payment is sufficient to pay the balance by the Maturity Date. If it is not, your payment will be increased by an amount necessary to repay the balance by the Maturity Date. You agree to pay not less than the Minimum Payment on or before the due date indicated on your periodic billing statement.

**How Your Payments Are Applied.** Unless otherwise agreed or required by applicable law, payments and other credits will be applied first to Finance Charges; then to unpaid principal; and then to late charges and other charges.

**Receipt of Payments.** All payments must be made in U.S. dollars and must be received by us consistent with the following payment instructions: All loan payments must be accompanied by the account number or payment coupon provided. Loan payments must be sent to First National Bank of Middle Tennessee, 200 East Main Street, McMinnville, TN 37110 or to any other full service branch location address. Loan payments may also be made in person to First National Bank of Middle Tennessee personnel in any of our branch lobby locations. Our hours of operation for receiving loan payments are 8:30 AM - 4:30 PM Monday-Thursday, 8:30 AM - 5:00 PM Friday. (Viola Branch hours of operation for receiving loan payments are 9:00 AM - 2:00 PM and Nashville Branch hours of operation for receiving loan payments are 8:30 AM - 4:30 PM), except bank holidays. All other payments received will be credited as of the next loan operations business day or as otherwise permitted by law. We may modify these payment instructions by providing updated payment instructions on or with your periodic billing statement.

**Credit Limit.** This Agreement covers a revolving line of credit for the principal amount of One Million Two Hundred Fifty Thousand & 00/100 Dollars ($1,250,000.00), which will be your "Credit Limit" under this Agreement. **During the Draw Period we will honor your request for credit advances subject to the section below on Lender's Rights.** You may borrow against the Credit Line, repay any portion of the amount borrowed, and re-borrow up to the amount of the Credit Limit. Your Credit Limit is the maximum amount you may have outstanding at any one time. You agree not to attempt, request, or obtain a credit advance that will make your Credit Line Account balance exceed your Credit Limit. Your Credit Limit will not be increased should you overdraw your Credit Line Account. If you exceed your Credit Limit, you agree to repay immediately the amount by which your Credit Line Account exceeds your Credit Limit, even if we have not yet billed you. Any credit advances in excess of your Credit Limit will not be secured by the Deed of Trust covering your principal dwelling.

**Charges to your Credit Line.** We may charge your Credit Line to pay other fees and costs that you are obligated to pay under this Agreement, the Deed of Trust or any other document related to your Credit Line. In addition, we may charge your Credit Line for funds required for continuing insurance coverage as described in the paragraph titled "Insurance" below or as described in the Deed of Trust for this transaction. We may also, at our option, charge your Credit Line to pay any costs or expenses to protect or perfect our security interest in your principal dwelling. These costs or expenses include, without limitation, payments to cure defaults under any existing liens on your principal dwelling. If you do not pay your property taxes, we may charge your Credit Line and pay the delinquent taxes. Any amount so charged to your Credit Line will be a credit advance and will decrease the funds available, if any, under the Credit Line. However, we have no obligation to provide any of the credit advances referred to in this paragraph.

**Credit Advances.** Beginning on the Effective Disbursement Date of this Agreement, you may obtain credit advances under your Credit Line as follows:

**Credit Line Checks.** Writing a preprinted "FNB EQUITY LINE CHECK" that we will supply to you.

**Telephone Request.** Requesting a credit advance from your Credit Line to be applied to your designated account by telephone. Except for transactions covered by the federal Electronic Fund Transfers Act and unless otherwise agreed in your deposit account agreement, **you acknowledge and you agree that we do not accept responsibility for the authenticity of telephone instructions and that we will not be liable for any loss, expense, or cost arising out of any telephone request, including any fraudulent or unauthorized telephone request, when acting upon such instructions believed to be genuine.**

**Requests By Mail.** Requesting an advance by mail.

**Requests in Person.** Requesting a credit advance in person at any of our authorized locations.

**NetTeller Transfer.** Electronically transferring funds from your NetTeller online.

If there is more than one person authorized to use this Credit Line Account, you agree not to give us conflicting instructions, such as one Borrower telling us not to give advances to the other.

**Limitations on the Use of Checks.** We reserve the right not to honor FNB EQUITY LINE CHECKs in the following circumstances:

**Credit Limit Violation.** Your Credit Limit has been or would be exceeded by paying the FNB EQUITY LINE CHECK.

**Post-dated Checks.** Your FNB EQUITY LINE CHECK is post-dated. If a post-dated FNB EQUITY LINE CHECK is paid and as a result any other check is returned or not paid, we are not responsible.

**Stolen Checks.** Your FNB EQUITY LINE CHECKs have been reported lost or stolen.

**Unauthorized Signatures.** Your FNB EQUITY LINE CHECK is not signed by an "Authorized Signer" as defined below.

**Termination or Suspension.** Your Credit Line has been terminated or suspended as provided in this Agreement or could be if we paid the FNB EQUITY LINE CHECK.

**Transaction Violation.** Your FNB EQUITY LINE CHECK is less than the minimum amount required by this Agreement or you are in violation of any other transaction requirement or would be if we paid the FNB EQUITY LINE CHECK.

If we pay any FNB EQUITY LINE CHECK under these conditions, you must repay us, subject to applicable laws, for the amount of the FNB EQUITY LINE CHECK. The FNB EQUITY LINE CHECK itself will be evidence of your debt to us together with this Agreement. Our liability, if any, for wrongful dishonor of a check is limited to your actual damages. Dishonor for any reason as provided in this Agreement is not wrongful dishonor. We may choose not to return FNB EQUITY LINE CHECKs along with your periodic billing statements; however, your use of each FNB EQUITY LINE CHECK will be reflected on your periodic statement as a credit advance. We do not "certify" FNB EQUITY LINE CHECKs drawn on your Credit Line.

**Transaction Requirements.** The following transaction limitations will apply to the use of your Credit Line:

**Credit Line FNB EQUITY LINE CHECK, Telephone Request, Request By Mail, In Person Request and NetTeller Transfer Limitations.** The following transaction limitations will apply to your Credit Line and the writing of FNB EQUITY LINE CHECKs, requesting an advance by telephone, requesting an advance by mail, requesting an advance in person and accessing by other methods.

**Minimum Advance Amount.** The minimum amount of any credit advance that can be made on your Credit Line is $500.00. This means any FNB EQUITY LINE CHECK must be written for at least the minimum advance amount.

**Limitation on All Access Devices.** You may not use any access device, whether described above or added in the future, for any illegal or unlawful transaction, and we may decline to authorize any transaction that we believe poses an undue risk of illegality or unlawfulness. Notwithstanding the foregoing, we may collect on any debt arising out of any illegal or unlawful transaction.

**Authorized Signers.** The words "Authorized Signer" on FNB EQUITY LINE CHECKs as used in this Agreement mean and include each person who (a) signs the application for this Credit Line, (b) signs this Agreement, or (c) has executed a separate signature authorization card for the Credit Line Account.

**Stop Payments.** We do not honor stop payment orders for FNB EQUITY LINE CHECKs drawn against your Credit Line Account. You therefore should not use your Credit Line Account if you anticipate the need to stop payment. You agree that we will have no liability to you or to any other party because we do not honor stop payment orders.

**Lost FNB EQUITY LINE CHECKs.** If you lose your FNB EQUITY LINE CHECKs or if someone is using them without your permission, you agree to let us know immediately. The fastest way to notify us is by calling us at (931) 473-4402. You also can notify us at FIRST NATIONAL BANK OF MIDDLE TENNESSEE 200 EAST MAIN STREET, MCMINNVILLE, TN 37110.

**Future Credit Line Services.** Your application for this Credit Line also serves as a request to receive any new services (such as access devices) which may be available at some future time as one of our services in connection with this Credit Line. You understand that this request is voluntary and that you may refuse any of these new services at the time they are offered. You further understand that the terms and conditions of this Agreement will govern any transactions made pursuant to any of these new services.

**Collateral.** You acknowledge this Agreement is secured by A DEED OF TRUST DATED 01/26/2023, TO LENDER IN FAVOR OF THE NAMED TRUSTEE CONVEYING REAL PROPERTY LOCATED IN WILLIAMSON COUNTY, TENNESSEE AND KNOWN AS 295 JONES PARKWAY, BRENTWOOD, TN.

**Insurance.** You must obtain insurance on the Property securing this Agreement that is reasonably satisfactory to us. You may obtain property insurance through any company of your choice that is reasonably satisfactory to us. You have the option of providing any insurance required under this Agreement through an existing policy or a policy independently obtained and paid for by you, subject to our right, for reasonable cause before credit is extended, to decline any insurance provided by you. Subject to applicable law, if you fail to obtain or maintain insurance as required in the Deed of Trust, we may purchase insurance to protect our own interest, add the premium to your balance, pursue any other remedies available to us, or do any one or more of these things.

**Right of Setoff.** To the extent permitted by applicable law, we reserve a right of setoff in all your accounts with us (whether checking, savings, or some other account), including without limitation, all accounts you may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. You authorize us, to the extent permitted by applicable law, to charge or setoff all sums owing on this Agreement against any and all such accounts.

**Periodic Statements.** If you have a balance owing on your Credit Line Account or have any account activity, we will send you a periodic statement, unless prohibited by applicable law. It will show, among other things, credit advances, **FINANCE CHARGES**, other charges, payments made, other credits, your "Previous Balance," and your "New Balance." Your statement also will identify the Minimum Payment you must make for that billing period and the date it is due.

**When FINANCE CHARGES Begin to Accrue.** Periodic **FINANCE CHARGES** for credit advances under your Credit Line will begin to accrue on the date of the credit advance. There is no "free ride period" which would allow you to avoid a **FINANCE CHARGE** on your Credit Line credit advances.

**Method Used to Determine the Balance on Which the FINANCE CHARGE Will Be Computed.** A daily **FINANCE CHARGE** will be imposed on all credit advances made under your Credit Line imposed from the date of each credit advance based on the "daily balance" method. To get the daily balance, we take the beginning balance of your Credit Line Account each day, add any new advances, and subtract any unpaid **FINANCE CHARGES** and any payments or credits. This gives us the "daily balance."

**Method of Determining the Amount of FINANCE CHARGE.** Any periodic **FINANCE CHARGE** is determined by applying the "Periodic Rate" to the balance described herein. Then we add together the periodic **FINANCE CHARGES** for each day in the billing cycle. This is your **FINANCE CHARGE** calculated by applying a Periodic Rate.

You also agree to pay **FINANCE CHARGES**, not calculated by applying a Periodic Rate, as set forth below:

**Additional Finance Charges.** The following additional **FINANCE CHARGES** will be charged to your Credit Line or paid in cash:

| | | |
|---|---|---|
| **Our Loan Origination Charge ($):** | **Financed** | **$495.00** |
| **Flood Certification:** | **Financed** | **$12.00** |
| **Release Fee:** | **Financed** | **$50.00** |
| **Wire Transfer Fee:** | **Financed** | **$25.00** |
| **Settlement or Closing Fee:** | **Financed** | **$525.00** |

Any additional **FINANCE CHARGES** shown above as "Financed" (not paid in cash) will be charged to your Credit Line and treated as a credit advance on which periodic **FINANCE CHARGES** will accrue, and will decrease the funds available under the Credit Limit.

**Periodic Rate and Corresponding ANNUAL PERCENTAGE RATE.** We will determine the Periodic Rate and the corresponding **ANNUAL PERCENTAGE RATE** as follows. We start with an independent index which is the PRIME RATE AS PUBLISHED IN THE WALL STREET JOURNAL (the "Index"). We will use the most recent Index value available to us as of the date of any **ANNUAL PERCENTAGE RATE** adjustment. The Index is not necessarily the lowest rate charged by us on our loans. If the Index becomes unavailable during the term of this Agreement, we may designate a substitute Index and margin upon notice to you. To determine the Periodic Rate that will apply to your First Payment Stream, we take the value of the Index, then divide the value by 365 days. To obtain the **ANNUAL PERCENTAGE RATE** we multiply the Periodic Rate by the number of days in a year (366 during leap years). This result is the **ANNUAL PERCENTAGE RATE** for your First Payment Stream. To determine the Periodic Rate that will apply to your Second Payment Stream, we add a margin to the value of the Index, then divide the value by 365 days. To obtain the **ANNUAL PERCENTAGE RATE** we multiply the Periodic Rate by the number of days in a year (366 during leap years). This result is the **ANNUAL PERCENTAGE RATE** for your Second Payment Stream. The **ANNUAL PERCENTAGE RATE** includes only interest and no other costs.

The Periodic Rate and the corresponding **ANNUAL PERCENTAGE RATE** on your Credit Line will increase or decrease as the Index increases or decreases from time to time. Any increase in the Periodic Rate will take the form of higher payment amounts. Adjustments to the Periodic Rate and the corresponding **ANNUAL PERCENTAGE RATE** resulting from changes in the Index will take effect DAILY. Notwithstanding the above provisions, the maximum increase or decrease in the interest rate at any one time on this loan will not exceed 3.000 percentage points. In no event will the Periodic Rate result in a corresponding **ANNUAL PERCENTAGE RATE** that is less than 3.500% or more than 18.000%, nor will the Periodic Rate or corresponding **ANNUAL PERCENTAGE RATE** exceed the maximum rate allowed by applicable law. Today the Index is 7.500% per annum, and therefore the initial Periodic Rate and the corresponding **ANNUAL PERCENTAGE RATE** on your Credit Line are as stated below:

**Current Rates for the First Payment Stream**

| Range of Balance or Conditions | Margin Added to Index | ANNUAL PERCENTAGE RATE | Daily Periodic Rate |
|---|---|---|---|
| All Balances | 0.000% | 7.500% | 0.02055% |

**Current Rates for the Second Payment Stream**

| Range of Balance or Conditions | Margin Added to Index | ANNUAL PERCENTAGE RATE | Daily Periodic Rate |
|---|---|---|---|
| All Balances | 1.000% | 8.500% | 0.02329% |

**Notwithstanding any other provision of this Agreement, we will not charge interest on any undisbursed loan proceeds, except as may be permitted during any Right of Rescission period.**

**Conditions Under Which Other Charges May Be Imposed.** You agree to pay all the other fees and charges related to your Credit Line as set forth below:

**Payment of Closing Costs.** If you elect to charge your Credit Line Account to pay the closing costs associated with your Credit Line (such as title insurance premiums, appraisal fees, credit report fees, and recording fees), the total of these charges will be reflected as "closing costs" on your first periodic billing statement.

**Returned Items.** You may be charged $30.00 if you pay your Credit Line obligations with a check, draft, or other item that is dishonored for any reason, unless applicable law requires a lower charge or prohibits any charge.

**Late Charge.** Your payment will be late if it is not received by us within **15 days after the "Payment Due Date" shown on your periodic statement.** If your payment is late we may charge you 5.000% of the unpaid amount of the payment.

**Prepayment Penalty.** If you pay your Credit Line balance in full, you may have to pay a prepayment penalty of Up to 2% of the credit limit with a maximum limit of $1,500.00. This amount represents finance charges and security interest charges paid on your behalf and will only be assessed if you require (for reasons including but not limited to the sale of the collateral), the Deed of Trust to be released within 3 years from the origination date.

**Security Interest Charges.** You agree to pay all security interest charges related to your Credit Line as set forth below:

| | |
|---|---|
| Appraisal Fee | $825.00 |
| Lender's Title Insurance | $3,648.00 |
| Closing Protection Letter | $50.00 |
| Recording Fees | $48.00 |
| State Tax/Stamps | $1,435.20 |
| **Total** | $6,006.20 |

**Lender's Rights.** Under this Agreement, we have the following rights:

**Termination and Acceleration.** We can terminate your Credit Line Account and require you to pay us the entire outstanding balance in one payment, and charge you certain fees, if any of the following happen: (1) You commit fraud or make a material misrepresentation at any time in connection with this Credit Agreement. This can include, for example, a false statement about your income, assets, liabilities, or any other aspects of your financial condition. (2) You do not meet the repayment terms of this Credit Agreement. (3) Your action or inaction adversely affects the collateral for the plan or our rights in the collateral. This can include, for example, failure to maintain required insurance, waste or destructive use of the dwelling, failure to pay taxes, death of all persons liable on the account, transfer of title or sale of the dwelling, creation of a senior lien on the dwelling without our permission, foreclosure by the holder of another lien, or the use of funds or the dwelling for prohibited purposes.

**Suspension or Reduction.** In addition to any other rights we may have, we can suspend additional extensions of credit or reduce your Credit Limit during any period in which any of the following are in effect:

(1) The value of your property declines significantly below the property's appraised value for purposes of this Credit Line Account. This includes, for example, a decline such that the initial difference between the Credit Limit and the available equity is reduced by fifty percent and may include a smaller decline depending on the individual circumstances.

(2) We reasonably believe that you will be unable to fulfill your payment obligations under your Credit Line Account due to a material change in your financial circumstances.

(3) You are in default under any material obligations of this Credit Line Account. We consider all of your obligations to be material. Categories of material obligations include the events described above under Termination and Acceleration, obligations to pay fees and charges, obligations and limitations on the receipt of credit advances, obligations concerning maintenance or use of the property or proceeds, obligations to pay and perform the terms of any other deed of trust, mortgage or lease of the property, obligations to notify us and to provide documents or information to us (such as updated financial information), obligations to comply with applicable laws (such as zoning restrictions), and obligations of any comaker.

(4) We are precluded by government action from imposing the **ANNUAL PERCENTAGE RATE** provided for under this Agreement.

(5) The priority of our security interest is adversely affected by government action to the extent that the value of the security interest is less than one hundred twenty percent (120%) of the Credit Limit.

(6) We have been notified by governmental authority that continued advances may constitute an unsafe and unsound business practice.

**Change in Terms.** We may make changes to the terms of this Agreement if you agree to the change in writing at that time, if the change will unequivocally benefit you throughout the remainder of your Credit Line Account, or if the change is insignificant (such as changes relating to our data processing systems). We may prohibit additional extensions of credit or reduce your Credit Limit during any period in which the maximum **ANNUAL PERCENTAGE RATE** under your Credit Line Account is reached.

**Collection Costs.** We may hire or pay someone else to help collect this Agreement if you do not pay. You will pay us that amount. This includes, subject to any limits under applicable law, our attorneys' fees and our legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, you also will pay any court costs, in addition to all other sums provided by law.

**Rate Increase.** In addition to our other rights during termination and acceleration, we may increase the variable **ANNUAL PERCENTAGE RATE** under this Agreement to 18.000 percent per annum. The **ANNUAL PERCENTAGE RATE** will not exceed the maximum rate permitted by applicable law. If we do not increase the **ANNUAL PERCENTAGE RATE** upon termination or acceleration of your Credit Line Account, it will continue at the variable rate in effect as of the date of termination or acceleration of your Credit Line Account.

**Access Devices.** If your Credit Line is suspended or terminated, you must immediately return to us all FNB EQUITY LINE CHECKs and any other access devices. Any use of FNB EQUITY LINE CHECKs or other access devices following suspension or termination may be considered fraudulent. You will also remain liable for any further use of FNB EQUITY LINE CHECKs or other Credit Line access devices not returned to us.

**Delay in Enforcement.** We may delay or waive the enforcement of any of our rights under this Agreement without losing that right or any other right. If we delay or waive any of our rights, we may enforce that right at any time in the future without advance notice. For example, not terminating your account for non-payment will not be a waiver of our right to terminate your account in the future if you have not paid.

**Cancellation by you.** If you cancel your right to credit advances under this Agreement, you must notify us in writing at the address shown on your periodic billing statement or other designated address and return all FNB EQUITY LINE CHECKs and any other access devices to us. Despite cancellation, your obligations under this Agreement will remain in full force and effect until you have paid us all amounts due under this Agreement.

**Prepayment.** You may prepay all or any amount owing under this Credit Line at any time, except we will be entitled to receive the prepayment penalty as stated above and to receive all accrued **FINANCE CHARGES**, and other charges, if any. Payments in excess of your Minimum Payment will not relieve you of your obligation to continue to make your Minimum Payments. Instead, they will reduce the principal balance

[redacted]



owed on the Credit Line. You agree not to send us payments marked "paid in full", "without recourse", or similar language. If you send such a payment, we may accept it without losing any of our rights under this Agreement, and you will remain obligated to pay any further amount owed to us. **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: FIRST NATIONAL BANK OF MIDDLE TENNESSEE, 200 EAST MAIN STREET MCMINNVILLE, TN 37110.**

**Notices.** All notices will be sent to your address as shown in this Agreement. Notices will be mailed to you at a different address if you give us written notice of a different address. You agree to advise us promptly if you change your mailing address.

**Credit Information and Related Matters.** You authorize us to release information about you to third parties as described in our privacy policy and our Fair Credit Reporting Act notice, provided you did not opt out of the applicable policy, or as permitted by law. You agree that, upon our request, you will provide us with a current financial statement, a new credit application, or both, on forms provided by us. You also agree we may obtain credit reports on you at any time, at our sole option and expense, for any reason, including but not limited to determining whether there has been an adverse change in your financial condition. We may require a new appraisal of the Property which secures your Credit Line at any time, including an internal inspection, at our sole option and expense.

**Transfer or Assignment.** Without prior notice or approval from you, we reserve the right to sell or transfer your Credit Line Account and our rights and obligations under this Agreement to another lender, entity, or person, and to assign our rights under the Deed of Trust. Your rights under this Agreement belong to you only and may not be transferred or assigned. Your obligations, however, are binding on your heirs and legal representatives. Upon any such sale or transfer, we will have no further obligation to provide you with credit advances or to perform any other obligation under this Agreement.

**Tax Consequences.** You understand that neither we, nor any of our employees or agents, make any representation or warranty whatsoever concerning the tax consequences of your establishing and using your Credit Line, including the deductibility of interest, and that neither we nor our employees or agents will be liable in the event interest on your Credit Line is not deductible. You should consult your own tax advisor for guidance on this subject.

**Notify Us of Inaccurate Information We Report To Consumer Reporting Agencies.** Please notify us if we report any inaccurate information about your account(s) to a consumer reporting agency. Your written notice describing the specific inaccuracy(ies) should be sent to us at the following address: FIRST NATIONAL BANK OF MIDDLE TENNESSEE 200 EAST MAIN STREET MCMINNVILLE, TN 37110.

**RATE CHANGES.** Not withstanding anything to the contrary contained in this agreement the rate of interest charged here under shall be set after the draw period at the effective rate defined herein. The term of any rate set is defined and can adjust each five (5) years from and including the opening date. The rate at the beginning of each five (5) year period after the draw period will be the PRIME RATE AS PUBLISHED IN THE WALL STREET JOURNAL (the "Index") plus a margin of 1.00%. This rate will be fixed for each five (5) year period and then resets thereafter at the same index and margin as described herein. Notice of any change in the interest rate charged will be sent before the effective change date. Nothing contained herein relating to interest shall supersede any of the lender's rights and remedies granted under the Lender's rights provisions of this agreement.

**Governing Law. This Agreement will be governed by federal law applicable to us and, to the extent not preempted by federal law, the laws of the State of Tennessee without regard to its conflicts of law provisions. This Agreement has been accepted by us in the State of Tennessee.**

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Interpretation.** You agree that this Agreement, together with the Deed of Trust, is the most reliable evidence of your agreements with us. If we go to court for any reason, we can use a copy, filmed or electronic, of any periodic statement, this Agreement, the Deed of Trust or any other document to prove what you owe us or that a transaction has taken place. The copy, microfilm, microfiche, or optical image will have the same validity as the original. You agree that, except to the extent you can show there is a billing error, your most current periodic statement is the most reliable evidence of your obligation to pay.

**Severability.** If a court finds that any provision of this Agreement is not valid or should not be enforced, that fact by itself will not mean that the rest of this Agreement will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Agreement even if a provision of this Agreement may be found to be invalid or unenforceable.

**Acknowledgment.** You understand and agree to the terms and conditions in this Agreement. By signing this Agreement, you acknowledge that you have read this Agreement. You also acknowledge receipt of a completed copy of this Agreement, including the Fair Credit Billing Notice and the early home equity line of credit application disclosure, in addition to the handbook entitled "What you should know about Home Equity Lines of Credit," given with the application.

**TRANSFERRABLE RECORDS AGREEMENT.** In the event this document is an Electronic Promissory Note, this document would be a Note under federal and state law. I expressly agree that this promissory note is to be treated as a transferrable record for purposes of compliance with federal and state electronic signature laws. It is my intent that by signing this document, I will ensure the transferability and enforceability of an electronic note.

**BORROWER:**

X Rob Beckham
ROBERT WARREN BECKHAM

**ACCEPTED: FIRST NATIONAL BANK OF MIDDLE TENNESSEE**

DocuSigned by:

By: Ellen May
ELLEN B MAY, Senior Vice President
D67D8C4EF46D402...

# BILLING ERROR RIGHTS

## YOUR BILLING RIGHTS

## KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

**Notify us in case of errors or questions about your bill.**

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet at

**FIRST NATIONAL BANK OF MIDDLE TENNESSEE**
**200 EAST MAIN STREET**
**MCMINNVILLE, TN 37110**

or at the address listed on your bill. Write to us as soon as possible. We must hear from you no later than sixty (60) days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:

Your name and account number.

The dollar amount of the suspected error.

Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay your bill automatically from your savings or checking account, you can stop the payment on any amount you think is wrong. To stop the payment, your letter must reach us three (3) business days before the automatic payment is scheduled to occur.

**Your rights and our responsibilities after we receive your written notice.**

We must acknowledge your letter within thirty (30) days, unless we have corrected the error by then. Within ninety (90) days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your Credit Limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date on which it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten (10) days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

LaserPro, Ver. 22.3.0.039 Copr. Finastra USA Corporation 1997, 2023. All Rights Reserved. - TN C:\LASERPRO\CFI\LPL\D25.FC TR-31165 PR-121